UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| BRANDON E. KLEIN, <br><br> Plaintiff, <br><br> v. <br><br> OFFICER BRIAN DANIELS, individually, <br><br> Defendant. | CAUSE NO.: 2:19-CV-484-TLS |

**OPINION AND ORDER**

This case arises out of the September 22, 2015 arrest of Plaintiff Brandon E. Klein for violating a protective order requiring him to stay away from 504 Benco Court, Schererville, Indiana. Following this Court's March 21, 2022 ruling on a motion to dismiss, this case remains pending on the Plaintiff's § 1983 Fourth Amendment unlawful pretrial detention claim against Defendant Officer Brian Daniels. *See* ECF Nos. 1, 51. This matter is now before the Court on Defendant Officer Daniels' Motion for Summary Judgment [ECF No. 83], which is fully briefed. Because probable cause existed for the Defendant's arrest of the Plaintiff and because the Defendant is entitled to qualified immunity, the Court grants the motion.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016)

(citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## EVIDENTIARY RULINGS

Pursuant to Northern District of Indiana Local Rule 56-1(f), the Defendant makes several evidentiary objections. Whether the subject of the objections or on the Court's own review, the Court disregards substantive arguments and characterization of evidence in the fact statements and considers the facts only as supported by the cited evidence of record.

First, the Defendant notes that the Plaintiff references entrapment and unlawful arrest for the first time in this case in his response brief. Although "district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's [summary judgment response brief] as a constructive motion to amend," *see Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023), the Plaintiff offers no argument, law, or analysis demonstrating an intent to bring these as new, separate claims. Therefore, the Court does not consider them to be separate claims.

Next, the Defendant argues that the sham affidavit rule requires exclusion of two statements in the Plaintiff's affidavit that contradict his prior deposition testimony. *See James v.*

2

*Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony."). First, in his deposition, the Plaintiff testified that his mother parked the car "at least 100 feet" from the end of the 504 Benco Court driveway, *see* Ex. C, 60:8–21; in his affidavit, he states that the car was "parked at the end of the street," *see* Ex. 1, ¶ 13.[1] Without more information about how far "the end of the street" is from the end of the driveway, it is not clear that the statements are contradictory. However, because the Plaintiff's deposition testimony that he was "at least 100 feet" from the driveway is quantifiable, the Court relies on it in the ruling below. Second, the Plaintiff testified that he eventually went inside the Schererville Police Department (SPD) to get his mother, Ex. H, 53:19–23, but states in his affidavit that he remained in the vehicle while his mother went inside, which is a direct contradiction. Ex. 1, ¶ 12. The Court disregards the affidavit to the extent it is relied on to show that the Plaintiff did not go inside the SPD.

      The Defendant next correctly argues that the audio recording of the Plaintiff's initial phone call to SPD dispatch directly disputes the Plaintiff's deposition testimony and affidavit statement that dispatch first told him he could go to 504 Benco Court and an officer would meet him there before instead instructing him to come to the station. Ex. 1, ¶ 9; Ex. C, 45:12–15, 46:11–25, 47:19–48:24. In the audio recording (quoted in full below in the Material Facts section), the Plaintiff asked, "Well, am I allowed to go over there if there's, I mean if there's . . ." to which dispatch responded, "I, I think, you—you should be able to if uh, you want to come into the station we can have an officer meet you here." Dispatch stated, "And then maybe you can explain the situation to them and maybe they can best advise you as to what—what you should do." Ex. D, 4:18–4:53; *see* Ex. D-1. The Plaintiff agreed and went to the SPD. *Id.*; Ex. C, 52:9–

---

[1] The Defendant's exhibits are filed at ECF Nos. 85 and 100, and the Plaintiff's exhibits are filed at ECF No. 93. The Plaintiff did not file page 2 of Exhibit 6.

22. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, the Court views these facts as set forth in the recording.

The Defendant also disputes the Plaintiff's contention that, in that recording, someone can be heard in the background saying, "Oh No!" after he stated his name. *See* Ex. D, 00:00–00:15. It is immaterial if those words were uttered, which is unclear given the background noise, because there is no evidence of who said the words or that they were uttered about the Plaintiff.

As argued by the Defendant, the Plaintiff's response brief includes a block quote from his mother's affidavit, but the affidavit does not contain those statements. *Compare* Pl. Resp. 21, ECF No. 93, *with* Ex. 2, ECF No. 93-2. Thus, the Court disregards the block quote.

Finally, the Plaintiff asserts, without citation to evidence, that the Defendant's probable cause affidavit relies on a "database entry" rather than "includ[ing] the verbiage of a judge-signed order." Pl. Resp. 17. The Court disregards this unsupported factual statement.

## MATERIAL FACTS[2]

On August 21, 2015, the Lake County, Indiana, Superior Court, in Cause No. 45D03-1508-PO-000181, issued an ex parte protective order ("protective order") on behalf of Leanne Salatas against Plaintiff Brandon E. Klein. Ex. B. The protective order was in effect from the date of issuance on August 21, 2015, to August 21, 2017. *Id.* Among other provisions in the protective order, "[the Plaintiff was] ordered to stay away from the residence, school, and/or

---

[2] The Plaintiff did not provide an "Additional Material Facts" section as required by Northern District of Indiana Local Rule 56-1(b)(2)(D). In the interests of justice, the Court considers the Plaintiff's "Background Facts" and "Material Facts in Dispute" sections, to which the Defendant, out of an abundance of caution, filed a Reply consistent with Local Rule 56-1(c)(2). Counsel for the Plaintiff is cautioned that a future failure to comply with Local Rule 56-1(b)(2) may result in the Court disregarding the asserted facts.

place of employment of [Salatas]. [The Plaintiff was] further ordered to stay away from the following place(s) that is/are frequented by [Salatas] and/or [Salatas'] family or household members: . . . 504 Benco Court, Schererville, Indiana 46375." *Id.* at 2–3. The protective order did not specify a minimum or maximum distance that the Plaintiff was required to stay away from that location and had no other limiting criteria. *Id.* The protective order also prohibited the Plaintiff from "threatening to commit or committing acts of domestic or family violence or stalking against [Salatas] and the following designated family or household members, if any"; no one else was listed. *Id.* at 2.

The Plaintiff was served with the protective order on or around August 21, 2015. Ex. C, 29:21–30:18. On September 22, 2015, he knew the protective order was in place, was aware of its terms, and understood that, pursuant to the protective order, he "was not to go to [Salatas'] residence or her parents' residence or grandmother's residence that she frequently visited," among other things. *Id.* 29:16–20, 30:18–31:11, 62:23–63:1. The Plaintiff knew that Salatas' parents' residence was 504 Benco Court, which is in a cul-de sac. *Id.* 32:11–19, 60:12–16.

On September 22, 2015, Defendant Officer Brian Daniels[3] was on duty, employed by the Town of Schererville as a police officer, and acting within the scope of his employment. Ex. A, ¶¶ 2, 4. At 11:31 a.m., the Plaintiff called the SPD and advised that his employer had mailed time-sensitive paperwork to 504 Benco Court. Ex. D, 0:03–0:18. After the dispatcher asked the Plaintiff if he had gone there to ask if they had the mail, the Plaintiff explained that he was not permitted to go to the location because of the protective order. *Id.* 3:43–3:58. The dispatcher then asked what he was requesting, and the Plaintiff asked if an officer could go to the residence. *Id.* 4:10–4:17. Then the following exchange took place:

---

[3] Officer Daniels has since been promoted to the rank of sergeant.

5

|  |  |
|---|---|
| DISPATCH: | They can probably go over there with you. I don't think they can go over and just, you know, start asking them for material that they may tell them we have no knowledge of. |
| PLAINTIFF: | Okay. Well, am I allowed to go over there if there's, I mean if there's . . . |
| DISPATCH: | I, I think, you—you should be able to if uh, you want to come into the station we can have an officer meet you here. |
| PLAINTIFF: | Okay. |
| DISPATCH: | And then maybe you can explain the situation to them and maybe they can best advise you as to what—what you should do. |
| PLAINTIFF: | Okay. |
| DISPATCH: | Okay sir? |
| PLAINTIFF: | Okay, uh I live, I live out in Crown Point and I'm at work. So I mean, I'll have to, have to come in and uh it will be a little bit before I get there but . . . |
| DISPATCH: | That'll, that'll be fine. We're open 24/7. |
| PLAINTIFF: | Alright, thank you. |
| DISPATCH: | Alright sir, have a good one. |
| PLAINTIFF: | Bye-Bye. |
| DISPATCH: | Bye. |

*Id.* 4:18–5:00; *see also* Ex. D-1.

After the call, the Plaintiff went to the SPD with his mother, Geralyn Klein; Ms. Klein initially went into the station, and then the Plaintiff went in to get her. Ex. C, 52:9–22; Ex. H, 53:19–23; Ex. 1, ¶ 12; Ex. 2, ¶ 5. Ms. Klein avers that she was told by dispatch to proceed to 504 Benco Court with the Plaintiff and that an officer would meet them there to retrieve the mail. Ex. 2, ¶ 6. Ms. Klein told the Plaintiff this, and they proceeded to 504 Benco Court. Ex. 1, ¶¶ 12–13.

Meanwhile, at about 12:17 p.m., the Defendant was dispatched to the SPD lobby to meet the Plaintiff; because the Defendant was close to 504 Benco Court, he told dispatch he would go there first and to advise the Plaintiff to wait at the station. Ex. A, ¶ 5; Ex. E, 28:4–10. At 12:25 p.m., the Defendant received a radio transmission requesting that he contact dispatch; at 12:26 p.m., the Defendant called dispatch and spoke with dispatcher Kelly Wynkoop. Ex. A, ¶¶ 6–7; Ex. F; Ex. G at 192_Schererville_PD_2015_09_22_12_25_20_by_Start_Time_desc.wav. Wynkoop told the Defendant that the Plaintiff stated he planned to go over to the property and

6

that she advised the Plaintiff not to go because of the protective order and suggested he wait for and deal with the officer. Ex. A, ¶ 8; Ex. F, 0:09–0:40. The Defendant asked Wynkoop to tell the Plaintiff that it would be a few minutes before he got to the station, which she agreed to do. Ex. A, ¶ 8; Ex. F, 1:24–1:29. Wynkoop told the Defendant that the Plaintiff might show up at Benco Court because the Plaintiff had expressed his intent to go there—even though she recommended against it—and had gone outside. Ex. A, ¶ 8; Ex. F, 1:29–1:43.

Shortly after the call with Wynkoop, the Defendant arrived at 504 Benco Court and met with Steven Salatas. Ex. A, ¶ 9. Then, as the Defendant was on the phone with Cheryl Salatas discussing the mail, the Plaintiff and his mother arrived at Benco Court. *Id.*; Ex. E, 33:5–7; *see also* Ex. G, at 192_Schererville_PD_2015_09_22_12_34_10_by_Start_Time_desc.wav. Ms. Klein parked the vehicle in the cul-de-sac, at its neck, facing and 100 feet from the 504 Benco Court driveway. Ex. A, ¶ 12; Ex. C, 60:8–21, 69:20–22; *see* Ex. E, 33:25–34:7. Ms. Klein walked to the driveway of 504 Benco Court and met with the Defendant and Steven Salatas. Ex. 1, ¶ 14. The Defendant asked Ms. Klein who was in the vehicle, and she said it was the Plaintiff. Ex. 2, ¶ 10. The Plaintiff was in the front passenger seat, remained in the vehicle throughout the encounter, and otherwise did not enter the property. Ex. A, ¶¶ 12–13; Ex. C, 135:16–18, 177:7–12; Ex. 1, ¶ 14. Although unsure, the Defendant "believed it was a good possibility" that the Plaintiff violated the protective order when he arrived on scene. Ex. E, 35:2–5; *see* Ex. A, ¶ 13.

The Defendant told Ms. Klein that the Plaintiff needed to leave the location because he was restrained from the residence, they should go back to the Police Department, and he would meet them there. Ex. A, ¶ 12; Ex. E, 35:9–17; Ex. G at "191_Schererville_PD_2015_09_22_12_35_01_by_Start_Time_desc," "188_Schererville_PD_2015_09_22_12_37_48_by_Start_Time_desc." Ms. Klein avers that she informed the Defendant they had been told by SPD to go to 504

Benco Court to meet with an officer to obtain the mail. Ex. 2, ¶ 11. The Defendant disputes that he was told the Plaintiff was sent by dispatch. Ex. I, 36:10–13. The Plaintiff could not hear what anyone said while he remained in the car. Ex. C, 72:10–14. While at 504 Benco Court, the Plaintiff did not tell the Defendant that someone from the SPD told him that he could go to 504 Benco Court; he speak to the Defendant at all. Ex. A, ¶ 21; Ex. C, 72:25–73:2, 8–23. Ms. Klein returned to the vehicle and told the Plaintiff that his mail was at the law offices of Sachs and Hess. Ex. 1, ¶ 15. Soon after, the Plaintiff and his mother left 504 Benco Court. Ex. A, ¶ 14. The Defendant had no other conversation with dispatch about the Plaintiff or the protective order before the Plaintiff's arrest. *Id.* ¶ 20; *see generally* Ex. G.

The Defendant returned to the SPD, located Deputy Prosecutor Bruno at around 12:57 p.m. at the Schererville Town Court, and discussed the events that happened at 504 Benco Court to determine whether he should file charges against the Plaintiff. Ex. A, ¶ 15. The Defendant described to Deputy Prosecutor Bruno what occurred at 504 Benco Court, including the following information that the Defendant was aware of at the time:

a. A valid and active ex parte protective order prohibited [the Plaintiff] from being near 504 Benco Court;

b. On September 22, 2015, [the Plaintiff] went to [the SPD] and advised that he wanted to retrieve paperwork from 504 Benco Court, but he had a protective order that prohibited him from the residence;

c. [The Plaintiff] knew that he had a protective order that ordered him to stay away from the residence;

d. Once [the Defendant] was informed of the situation by dispatch, [he] told dispatch to advise [the Plaintiff] to remain at the Police Department and [he] would be back . . . to the station to talk to him;

e. That [the Defendant] spoke with Wynkoop, who told [him] that dispatch advised [the Plaintiff] of [his] intent and that they advised [the Plaintiff] that he should not go to 504 Benco Court because of the protective order after [the Plaintiff] stated that he was going to go to there;

8

    f. [The Defendant] went to 504 Benco Court to try to locate the paperwork;

    g. While [the Defendant] was speaking with Steven Salatas and Cheryl Salatas at 504 Benco Court, [the Plaintiff] and his mother arrived at Benco Court in a vehicle;

    h. The vehicle parked in front of 504 Benco Court's driveway and in the cul-de-sac;

    i. [The Defendant] observed [the Plaintiff] in the front passenger seat of the vehicle;

    j. [The Defendant] told Ms. Klein that [the Plaintiff] needed to leave the location immediately because he was restrained from being there;

    k. [The Defendant] told Ms. Klein that they should go back to the Police Department and [he] would meet them there;

    l. [The Plaintiff] partially exited the vehicle and started yelling things, including profanities, at [the Defendant] and Mr. Salatas;

    m. Aside from yelling and using profanities, [the Plaintiff] did not speak to [the Defendant] while at 504 Benco Court;

    n. That [the Plaintiff] did not enter the property of 504 Benco Court; and

    o. [The Plaintiff] and his mother drove away shortly thereafter.

Ex. A, ¶ 16; Ex. E, 44:10–21, 68:17–19. Deputy Prosecutor Bruno advised the Defendant that he could file charges for invasion of privacy with a protective order. Ex. A, ¶ 17.

After learning at the Sachs and Hess law firm that his mail was not there, the Plaintiff called the SPD to press charges against Leanne Salatas for interfering with his mail and was told to come to the station. Ex. 1, ¶¶ 17, 19. The Plaintiff arrived at the station soon after and waited in the lobby. Ex. A, ¶ 19; Ex. 1, ¶¶ 20, 22. After confirming with Deputy Prosecutor Bruno that he could arrest the Plaintiff, the Defendant arrested the Plaintiff in the lobby for the invasion of privacy charge at around 1:24 p.m. Ex. A, ¶¶ 18, 19. The Plaintiff avers that the Defendant yelled at him before placing him under arrest. Ex. 1, ¶¶ 23, 24.

The probable cause affidavit completed by the Defendant describes the protective order as ordering the Plaintiff to "stay away from 504 Benco Ct & is restrained from having contact with Steven & Cheryl Salatas." Ex. 6. It further provides that the Plaintiff violated the protective order by "showing up in front of the home & yelling at Steven & myself." *Id.*

After being arrested and booked, the Plaintiff told the Defendant that an SPD representative had told him he could go to 504 Benco Court despite the protective order. Ex. 1, ¶ 25; *see* Ex. C, 184:1–6. The Plaintiff avers that the Defendant confirmed that he knew of the direction the Plaintiff had received from dispatch. Ex. 1, ¶ 25.

The Plaintiff disputes that he was prohibited from communicating with Steven Salatas or that he yelled at the Defendant and Steven Salatas while in the vehicle at Benco Court. Ex. C, 167:1–5, 168:1–5, 169:4–18.

## ANALYSIS

42 U.S.C. § 1983 "provides a remedy for violations of federal rights committed by persons acting under color of state law." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). The Fourth Amendment to the United States Constitution "guarantees citizens the right to be secure in their persons . . . against unreasonable . . . seizures of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (cleaned up). Under the Fourth Amendment, a "pretrial detention is a seizure . . . and is justified only on probable cause." *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019) (cleaned up). The Defendant seeks summary judgment on the Plaintiff's § 1983 Fourth Amendment unlawful pretrial detention claim on the bases that there was probable cause to arrest the Plaintiff and that he is entitled to qualified immunity.

**A.    Probable Cause**

"Probable cause to make an arrest exists when a reasonable person confronted with the sum total of the facts known to the officer at the time of the arrest would conclude that the person arrested has committed . . . a crime." *United States v. Brown*, 973 F.3d 667, 706 (7th Cir. 2020) (citation omitted); *see Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). This "is a common-sense inquiry requiring only a probability of criminal activity." *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021). "This is not a high bar." *Id.* (cleaned up) (citing *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). Probable cause is "assessed objectively based on the conclusions that the arresting officer reasonably might have drawn from the information known to him." *Young*, 987 F.3d at 644 (cleaned up). "The officer['s] subjective intentions are irrelevant so long as there was probable cause to detain . . . for any crime." *Brown*, 973 F.3d at 706 (citing *Devenpeck v. Alford*, 543 U.S. 146, 154–55 (2004)). "Probable cause requires more than bare suspicion, but need not be based on evidence sufficient to support a conviction, not even a showing that the officer's belief is more likely true than false." *Maltby v. Winston*, 36 F.3d 548, 556 (7th Cir. 1994).

As argued by the Defendant, the Plaintiff's unlawful pretrial detention claim fails because a reasonable person confronted with the facts and circumstances known to the Defendant at the time of the Plaintiff's arrest would agree that probable cause existed for the arrest. Under Indiana law, "[a] person who knowingly or intentionally violates . . . an ex parte protective order . . . commits invasion of privacy, a Class A misdemeanor." Ind. Code § 35-46-1-15.1(a)(2). Conduct is done "intentionally" if the individual has a conscious objective to engage in the conduct and done "knowingly" if the individual is aware of a high probability that he is engaging in the conduct. Ind. Code § 35-41-2-2(a), (b).

11

Here, the objective facts known to the Defendant prior to the Plaintiff's arrest included the following. On September 22, 2015, a valid and active ex parte protective order existed ordering the Plaintiff to stay away from 504 Benco Court, and the Plaintiff knew the terms of the protective order and that it was in effect. That day, the Plaintiff went to the SPD to advise that he wanted to retrieve his mail from 504 Benco Court. Once informed of this request by phone, the Defendant told the dispatcher to advise the Plaintiff to remain at SPD and that he would talk to the Plaintiff there; the dispatcher confirmed that she would advise or did advise the Plaintiff as requested. In the same phone call, the dispatcher told the Defendant that the Plaintiff said he was going to 504 Benco Court and she had recommended that he not do so and instead wait at the station. The Defendant did not have any further communication with dispatch concerning the Plaintiff prior to his arrest. Once at 504 Benco Court and having been informed by dispatch that the Plaintiff was told not to go to there, the Defendant observed the Plaintiff and his mother arrive at Benco Court, the Plaintiff in the front passenger seat, and the vehicle park in the cul-de-sac 100 feet from 504 Benco Court. After the Plaintiff's mother got out of the car and told the Defendant they were told to come to the residence,[4] the Defendant stated that the Plaintiff needed to leave the location immediately because he was restrained from being there. The Plaintiff did not speak to the Defendant while at the location. The Plaintiff did not enter the property of 504 Benco Court, and the Plaintiff and his mother soon left the premises.

---

[4] Although the Defendant disputes that he was told that dispatch told the Plaintiff and his mother to go to 504 Bench Court, the Court views the facts in the light most favorable to the non-moving party on summary judgment. While dispatch's recorded phone call with the Defendant informing him that the Plaintiff was told *not* to go to Benco Court contradicts Ms. Klein's testimony that they were told to go to Benco Court, there is no recording of the conversation inside the SPD between dispatch and Ms. Klein. Regardless, the relevant knowledge for the probable cause inquiry is what the Defendant knew at the time.

The Defendant cites *Hendricks v. State*, in which the court found that being within 1000 feet of a restricted person was sufficient to sustain a conviction for invasion of privacy for a violation of a protective order. 649 NE.2d 1050, 1052 (Ind. Ct. App. 1995).[5] Consistent with *Hendricks*, a reasonable officer in the Defendant's position would agree that probable cause existed to arrest the Plaintiff for invasion of privacy. The language of the protective order required the Plaintiff to "stay away from" 504 Benco Court, and the Plaintiff was aware of the protective order. The Plaintiff admitted to purposefully driving to and parking 100 feet from 504 Benco Court, visible inside the front passenger seat of the vehicle while his mother spoke with the Defendant at 504 Benco Court. Even though the Plaintiff did not exit the vehicle or enter the property, the protective order required him to "stay away" from the address, and 100 feet is significantly less than the 1000 feet the Indiana Court of Appeals in *Hendricks* found violated a protective order. There is no dispute that the Plaintiff intended to be in the vehicle 100 feet from the restricted address.

In response, the Plaintiff argues that the Defendant violated the Fourth Amendment by including false statements in and omitting information from the probable cause affidavit. An officer violates the Fourth Amendment if the officer intentionally or recklessly (1) includes false information in a probable cause affidavit and those statements are material to finding probable cause or (2) withholds material information from a probable cause affidavit. *Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019) (citations omitted). To determine whether false statements or omissions are material, the court will "eliminate the alleged false statements,

---

[5] The Defendant also cites *Porter v. State*, No. 49A02-0703-CR-217, 2007 WL 4180656, at *3 (Ind. Ct. App. Nov. 28, 2007), and *Evans v. State*, No. 49A05-0707-CR-415, 2008 WL 540764, at *1–2 (Ind. Ct. App. Feb. 29, 2008), which further support a finding of probable cause in this case. However, as memorandum decisions, they are uncitable and have no precedential value under Indiana Rule of Appellate Procedure 65(D)(2). *See, e.g.*, *Johnson v. United States*, 24 F.4th 1110, 1121 n.3 (7th Cir. 2022).

incorporate any allegedly omitted facts, and then evaluate whether the resulting 'hypothetical' affidavit would establish probable cause." *Id.* (quoting *Betker v. Gomez*, 692 F.3d 854, 862 (7th Cir. 2012)). The Plaintiff contends that the false information included in the probable cause affidavit was the statements that he yelled at the Defendant and Steven Salatas and that he was prohibited from communicating with Steven Salatas. However, these statements are not material to the probable cause determination because probable cause still exists when those statements are removed from the affidavit. The Plaintiff was knowingly 100 feet from 504 Benco Court, and the protective order ordered him to "stay away" from that address.

The Plaintiff also contends that the Defendant withheld the information that SPD dispatch told the Plaintiff he could go to 504 Benco Court. However, before and at the time of the Plaintiff's arrest, the Defendant was unaware of any such directive from dispatch. Rather, the evidence based on the recording of the Defendant's conversation with dispatch on his way to 504 Benco Court is that the dispatcher informed the Defendant that she told the Plaintiff to remain at the police station and that, in accordance with the Defendant's request, she would advise the Plaintiff not to go to 504 Benco Court. The Plaintiff did not talk to the Defendant while at 504 Benco Court, and the Plaintiff testified that he did not inform the Defendant of the alleged directive from dispatch until after he was arrested and being booked, which was after probable cause was established. Because the probable cause determination is based on the officer's knowledge at the time of the arrest, this information learned after the arrest could not have been knowingly or intentionally withheld by the Defendant.

Regardless, even if the Defendant had been told before the Plaintiff's arrest of the alleged directive by dispatch to go to the residence—by either the Plaintiff or his mother (who testified she told the Defendant of the directive while at 504 Benco Court), probable cause is still not

defeated. Once an officer believes probable cause exists, there is no constitutional duty to continue investigating to determine whether the suspect's (or his mother's) claim of innocence is correct. *See Kelley v. Myler*, 149 F.3d 641, 646–47 (7th Cir. 1998) (citation omitted) ("The inquiry is whether an officer has reasonable grounds on which to act, not whether it was reasonable to conduct further investigation."); *see also Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) ("[T]his court has emphasized that once probable cause has been established, officials have 'no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.'" (quoting *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995)). At the time he observed the Plaintiff arrive in the vehicle and park 100 feet from and facing 504 Benco Court, the Defendant "believed it was a good possibility" the Plaintiff had violated the protective order based on the information he had from dispatch. Again, the dispatcher had just informed the Defendant that she told the Plaintiff not to go to 504 Benco Court and instead to stay at the station. This is sufficient to satisfy the probable cause requirement. "[T]he fact that the officer later discovers additional evidence unknown to him at the time of the arrest is irrelevant to whether probable cause existed at the crucial time." *Braun v. Village of Palatine*, 56 F.4th 542, 549 (7th Cir. 2022) (citation omitted).

Because there was probable cause for the arrest, the Court grants summary judgment for the Defendant on the remaining claim of Fourth Amendment unlawful pretrial detention.

**B.      Qualified Immunity**

In addition, the Defendant is entitled to qualified immunity, which "shields public officials 'from undue interference with their duties and from potentially disabling threats of liability.'" *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). "Qualified immunity 'gives government officials breathing room to make

reasonable but mistaken judgments about open legal questions' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). It is the plaintiff's burden to overcome the affirmative defense once raised. *Id.* (citing *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008)). A plaintiff must show (1) "a violation of a constitutional right" and (2) that "the federal right at issue was clearly established at the time of the alleged violation." *Id.* (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2015)).

On the first element, the Plaintiff has not shown a violation of a constitutional right, as set forth above. Even if he had shown a constitutional violation, the Plaintiff has failed to show that it was clearly established that a reasonable officer would not have arrested him for violating the protective order when he intentionally arrived at and parked 100 feet away from the restricted residence. To overcome the burden, "the clearly established right must be defined with specificity." *Id.* at 742 (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019)). Courts look to "whether precedent squarely governs the facts at issue." *Id.* Thus "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established" and the test is "whether the law was clear in relation to the specific facts confronting the public official when he acted." *Kemp v. Liebel*, 877 F.3d 346, 351–52 (7th Cir. 2017) (citations omitted). Although a plaintiff need not identify a case on point, "the legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023) (citation omitted). The Plaintiff has identified no law to show that the circumstances facing the Defendant did not reasonably support a finding of probable cause or that it was clearly established that a reasonable officer would not have arrested the Plaintiff for a violation of the protective order for being in the car 100 feet from the prohibited address.

Instead, the Plaintiff argues that "falsifying the factual basis for a probable-cause determination violates the Fourth Amendment." *Lewis*, 914 F.3d at 477. But as set forth above, the offending language in the probable cause affidavit was not material because there remains a basis for probable cause by the Plaintiff being 100 feet from the prohibited address. And, if the Defendant's interpretation of the facts was mistaken, he is still entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" (citation omitted)); *see also Spiegel*, 196 F.3d at 724 (rejecting the argument that certain facts would have caused a reasonable officer to take further investigative steps because the facts did not "render . . . incredible" the facts the officer relied on to find probable cause and finding the officer was entitled to qualified immunity). Thus, even if there was a constitutional violation, the Defendant is entitled to qualified immunity, and the Court grants summary judgment for the Defendant.

In addition, even if the law was clearly established, the Defendant is entitled to qualified immunity because he relied on the advice of counsel. Qualified immunity based on reliance on the advice of counsel requires a court to consider "how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, whether complete information had been provided to the advising attorney(s), the prominence and competence of the attorneys, and how soon after the advice was received the disputed action was taken." *Davis v. Zirkelbach*, 149 F.3d 614, 620 (7th Cir. 1998) (citation omitted); *see also Morrell v. Mock*, 270 F.3d 1090, 1102 (7th Cir. 2001). Prior to the arrest, the Defendant provided the deputy prosecutor with the material information he knew at the time—as detailed above, which was sufficient to establish probable cause. In response, the Plaintiff argues only that the information provided to the

17

prosecutor was incomplete because it omitted the information that dispatch had told him to go to the residence. But once again, the Defendant was told the opposite by dispatch—that the Plaintiff was told *not* to go the residence and was told to stay at the station; thus, the Defendant did not omit information. The Court grants summary judgment for the Defendant on this additional ground.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendant Officer Daniels' Motion for Summary Judgment [ECF No. 83] and DENIES as moot the Plaintiff's Motion Requesting Oral Argument [ECF No. 95]. The Court DIRECTS the Clerk of Court to enter judgment for Defendant Officer Brian Daniels and against Plaintiff Brandon E. Klein on the remaining Fourth Amendment unlawful pretrial detention claim. The Plaintiff takes nothing by his Complaint.

SO ORDERED on January 2, 2025.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT